Good morning, Honorable Judges. Dale Gronemeyer for the Appellant. Plaintiff below, Dr. Christopher Johnson, brings claims against the Riverside Community Hospital and the related persons arising from his harassment, his, while he was a staff doctor, his denial of privileges and the subsequent, the post-employment, or, I'm sorry, his post-relationship interference with his employment, and based upon claims of sexual orientation and race bias. Counsel, I understand there are three issues here. The 1981 claim, the Unruh Act claim, and then the FEHA claim. When you discuss your argument, please focus on which of those three we're talking about, because sometimes there's a little bit of overlap. Let me start with the Unruh Act claim. Judge Timlin, in the initial of the two orders at issue here, dismissed those claims with prejudice based upon it not being, the hospital not being a business establishment. That perhaps was a reasonable interpretation at that time based upon the Ninth Circuit's Strother decision. However, subsequent to his decision, the Payne decision became final. It was not final at the time of his decision. Under California law, it couldn't be cited. And Payne squarely holds the opposite, that a hospital, with respect to the issue of staff privileges, is a business established under the Unruh Act. Counsel, when I was reading Payne, it occurred to me that the state of California law is a little murky. The question being, what would the Supreme Court of California do with Payne? And it occurred to me, is this the kind of issue we might certify to the California Supreme Court for determination? At least as to the Unruh Act question. I don't believe that there is any ambiguity as to the intermediate appellate court decision. It's clear. The Supreme Court had the opportunity to review it because there was a petition for review. Well, your opposing counsel is going to tell us, I'm sure, that he's not persuaded that Payne truly represents the law of the state of California. Well, I think this Court is bound to file the intermediate appellate decision. Unless there is good reason to believe the California Supreme Court would decide otherwise, given that they declined to do it in the Payne decision, I don't think that's a tenable decision. Well, in any event, with respect to Payne itself, was Payne a customer? Was Payne an employee? What's his status? And then compare that with the status of Dr. Johnson. Payne was a staff physician, dealt with the issue of expulsion or loss of privileges, just as Dr. Johnson's exactly on point. I don't think there's any distinction between the two. Do you attribute any importance to the fact that Dr. Payne was not being paid by his hospital while your client was being paid at the hospital where he was on staff? Does that payment put your client closer to an employee relationship? Well, I think my client was an independent contractor. That was Judge Timlin's analysis. That's what the agreement says, Section 5.5 of Exhibit B, to both of the complaints. And that is most typically the relationship of staff physicians to hospitals. That's not the relationship Dr. Payne had with his hospital, is it? As an independent contractor? Absolutely. Well, your client, at least on this record, is able to make up to $10,000 a month from payments directly from the hospital. What's the difference, if any, between that and what Dr. Payne could get, not in payments from his clients or his patients, but from the hospital itself? In all candor, I haven't reviewed Payne to see exactly whether Payne—I can't answer the question whether—that frankly hadn't occurred to me before—whether Dr. Payne could get paid by the hospital. Again, Judge Timlin went through that analysis. He concluded that Dr. Payne, based upon—I mean, Dr. Johnson, based upon California law and the agreement, seven of the twelve factors to be considered pointed towards this being an independent contractor. I think that is a correct analysis. You know, it's not just would you get paid. It includes such things as supervision, level of, you know, your own responsibility. I mean, there are twelve factors under California law that are analyzed, and Judge Timlin went through and did a very workmanlike job of analyzing those factors. Counsel, the UNRRA Act is a public accommodations act. It's designed to make certain that in certain areas that people are not discriminated against. In this situation, didn't Dr. Johnson—wasn't virtually everything that he did supervised or controlled? Did he have the right, for example, to just decide at 8 o'clock I'm going to be in the operating room and do X and Y? He couldn't do that, could he? There were some levels of control. Again, it's one factor. Okay, one factor, but let's go through the factors. He gets paid by the hospital, right, in part? In part. Okay, and does he determine what nurses work with him? I don't believe so. He doesn't, does he? Does he determine what credentials he has to have in order to be in the hospital? No. Didn't he have to be approved by a board of the hospital to work there in the first place? Yes. I mean, if you go through this analysis about the independent contractor, I'm puzzled as to why, regardless of what the agreement says, why the facts don't show that he was like an employee. He had virtually no discretion. He had control in almost everything he did. How could he possibly be an independent contractor for purposes of the UNRRA Act? Well, because seven of the 12 factors to be considered under California law point the opposite way, and you can't cherry pick the five that are. Tell me what the seven are. What I'd be doing is repeating what. Can you cite me in the record what I should look for to see where these seven factors are? I read what the judge said and thoroughly disagree with him. I'm just interested to find out where in the record it shows that this man was an independent contractor in fact. The independent contractor relationship is pleaded, and the contract is attached as an exhibit incorporated by reference. That's the basis upon which the – this, of course, is a motion to dismiss. Right. And it's based upon the facts in the complaint. I understand. So we have to take everything as being true, but those issues of law we don't take as true. There are issues of law that we don't assume that something that's pleaded is correct for purposes of being an independent contractor or not, do we? No, I think you review those de novo. Right. That's correct. So I guess I'm struggling with how the UNRRA Act applies to this man. I know you're citing Payne, but aren't the facts in Payne distinguishable from this situation? Well, you can draw some distinctions. You know, you have a continuum from Payne to Strother, and Dr. Johnson is certainly not as – I certainly agree, not as clear-cut as Payne, but certainly not Strother where she was a partner of a – of Kaiser and, you know, had a – but had, you know, was one of 2,500 and, I believe, exclusively practiced with Kaiser a completely different kind of relationship than with Dr. Johnson. Is Johnson's remedy under FEHA? I think his remedy is under the UNRRA Act and under 42 SC 1981. I think the FEHA remedy is, in my view, is important only in the event that – the FEHA remedy, in my view, is important simply for the subsequent interference of the employment claim. That would be my view of what – or the case – how the case should appropriately be tried and that we would end up. But it is also a backup for the FEHA contentions. Thank you, counsel. Your time has expired. You'll hear from the hospital. Good morning, Your Honors. James Payne on behalf of Appalee's Riverside Health Care System and Columbia HCA. And at counsel's table is Tami Smason, who represents the medical staff of Riverside Community Hospital, and Dr. Duncan. Are you going to share time or will you be consuming all the time? I think we're just going to answer questions. Yeah, I'm just available to answer any questions. All right. Thank you, counsel. And I assume you're no relation to Dr. Payne. None whatsoever, Your Honor. Same spelling. All right. I would like to first briefly discuss the disposition of the Fair Employment Housing Act claims. Well, since we were focusing on UNRUH, could we just do that first and then, if you don't mind, then come back to your other point? Certainly. With regard to the UNRUH Act issue, as the questions predicted, I am going to take the position that the Payne decision was wrongly decided by the California Court of Appeal and, in fact, the highest court in the State, the Supreme Court, would decide it otherwise. What's the standard that we apply in ascertaining that, counsel? I believe two things. One is looking at the decision itself and the construction given to the UNRUH Act by the two-person majority of the Court of Appeal. And also, I think that the dissent was very well reasoned, and in that particular case, the dissent said Dr. Payne specifically alleged I'm sorry, that the dissent said Dr. Payne did not allege he was a client, patron, or customer of the hospital, as would be required by a 35-year-old authority from the California Supreme Court interpreting the Act, which was the Alcorn decision. The majority's extension of the Act is unprecedented and contrary to all authority cited in its own opinion and in the dissent. And I believe that is true. If you go back and look at the Alcorn decision with the California Supreme Court, as well as the Rojo v. Klinger decision, those cases make very clear that the UNRUH Act is not deemed to apply to employment-like activities. It's deemed to apply to a business establishment who is serving or not serving customers or patrons or service providers in that fashion. What I'm looking for, though, is this. Under our precedence, we have certain obligations vis-à-vis state appellate courts now. And the question is, how do we go about applying the rule that we have to apply unless it's distinguishable on the facts? We have to apply controlling state appellate authority unless there is convincing evidence that the Supreme Court would decide contrary. How does that work? What do we do? Look at previous Supreme Court cases, show how different they are? Is that the standard? Yes, I think that would be the standard. And also I would look at the Ninth Circuit's prior decision in the Strothers case where the Act was thoroughly analyzed and there is an existing Ninth Circuit decision more or less on point going the other direction from that which the two courts specifically with respect to that. To what extent does Strother control Trump or somehow prevail over Payne? And to what extent can Payne be distinguishable from the standpoint of the plaintiff in this case? Yes, Your Honor. Plainly, the Strother case relied upon the two California Supreme Court decisions that I just cited. That panel appropriately looked to what the California Supreme Court would rule under the circumstances, analyzed those cases, and came up with the opinion that the Unruh Act did not apply in an employment-like setting. I believe that under those circumstances, this panel should certainly be guided by the prior panel's decision in the Strother case, and in addition to that, look to those Supreme Court precedents. Well, you do have counsel on the other side that cites Payne, and we have to take it into account. Why? We can't ignore it, can we? Even with Strother out there, we can't ignore Payne, can we? To some extent, I think it can be ignored, and I think there are some facts that distinguish the Payne case from the Johnson case. Tell us about those. Specifically, the Payne case, the majority was very adamant to point out that Dr. Payne had not sought any remedies under the California Fair Employment and Housing Act and did not allege anywhere in his complaint that there was any employment-like relationship between himself and the hospital. In contrast, in this case, Dr. Johnson filed a complaint with the California Fair Employment and Housing Department complaining of discrimination in the workplace. In addition to that ---- Do you view Unruh and FEHA as being mutually exclusive in this context? I do. I do. I think the Unruh Act was established to alleviate an entire separate category of discrimination than FEHA was enacted to deal with, and I think they are mutually exclusive. In this case, if you look also at Dr. Johnson's complaint, he's alleged workplace discrimination. He's made claims under the Fair Employment and Housing Act. In paragraphs 28 and 29 of his complaint, he alleged that there was a hostile work environment. In paragraph 21 of his complaint, he alleges that he was, quote-unquote, working at the hospital. So I think that the facts, as alleged by Payne, are very different than the facts that we have before us in Johnson, insofar as Dr. Johnson elected to make claims that there were workplace types of discrimination and pursue remedies under the Fair Employment and Housing Act through the agency as well as in court. With regard to the FEHA claims themselves that I started to talk about at the initial, at the outset, I think the papers on that are fairly clear in terms of our position. There was a failure to bring that claim in the federal court within the one-year time frame after the issuance of the right-to-sue letter, and I don't believe that the concepts of equitable estoppel or equitable tolling apply in this context. Relative to the Section 1981 claims, in going back through this and in preparation of the appeal and reengineering the situation, the 1981 claim was jumbled together, I think, with a Title VII claim in the first cause of action. The Title VII claim was ultimately dismissed. The action was, a first-amendment complaint was then filed. The appellant is correct that there was no motion made that the 1981 claim was barred by the statute of limitations, and the court in Judge Collins in the second order adopted all of the comments in Judge Timlin's 26-page decision and also then subsequently dismissed the action as failure to state a claim for all the various reasons. I agree with the appellant that the decision on that subject was ambiguous in terms of how it came out that way, and therefore I've been in the position of arguing that it can be sustained based on the record and based on the fact that the complaint on its face didn't set forth sufficient allegations to give rise to a claim for race discrimination under Section 1981. I'd like to take you back to the UNRRAC claim for a moment, if I could. Certainly. You're not contending that UNRRAC claims can't arise in a workplace setting, are you? In other words, not an employment setting, but it just happens to involve workplace issues? I believe that it can arise in a workplace if you consider a workplace to be a business establishment. So you might have employees that are serving customers. If you have a subcontractor who claims he can't get a contract because he's black, is that going to be precluded in your view from an UNRRAC claim because it arises in a workplace setting? If under those circumstances the person is not basically in a workplace-type setting, I believe the UNRRAC could apply to that. For example, if the person was a building contractor and was coming in to remodel one of the rooms and was not at the hospital being paid by the hospital and associating with hospital employees on a day-in and day-out basis. And so the purest doctor case is one that you think is just not close enough to that, and that's the doctor that says, I don't want to get paid by the hospital, I don't want anything from the hospital except staff privileges, and you're not giving me staff privileges. You contend that's just too close to the workplace setting somehow? I believe in most contexts that is too close to the workplace setting because the doctor, as I understand the analogy, would be one who would be coming on to the premises on a daily or regular basis. As opposed to the subcontractor? Yes, who would probably just be there for one assignment or one particular project. That's partly the longevity of the relationship? I think it's the nature of the relationship altogether which would include the longevity. Thank you. Just one final question, if I may. There's a threshold in UNRWA in terms of the number of people employed or involved as members. How many people are employed by the defendants in this case? Your Honor, that is not on the record, and I don't know the answer to that question. Would it be over 400? Is there anything on the record? There's nothing on the record that would indicate. Okay. There's nothing covered on that. Right. Okay. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Smith, Mosman